Good morning, Your Honor. May it please the Court, my name is Pete Thompson from the Thompson-Lawson Judge in Washington, and I'm appearing here on behalf of TIG, the appellant. This case does not present any easy in-between outcomes. It's a case of extremes. The insurance company that I represent essentially takes the following position, that it sought judicial guidance concerning its obligation as soon as a demand on it was made. It obtained judicial guidance from a trial court where it lost, from a court of appeals where it won, and ultimately from the California Supreme Court where it lost on a 4-3 decision. That decision established the basic proposition that under an insurance policy that my client had issued for a one-year term in 1980, but in which my client had not, upon the expiration of that policy, filed a notice of cancellation with the Public Utilities Commission. Well, I think we know what the facts are here, and I think procedurally we know what the courts have done. But, I mean, the California Supreme Court held in the coverage dispute here that your policy was in effect in 1989, and it didn't qualify that holding in any way. So I'm just wondering, why is that not dispositive? And then I know that you make your surety arguments, but how can you get around the duty to settle once it's been determined that the policy was in effect? Why aren't you bound by Samson? I mean, you make some creative arguments, but I'm struggling with those two cases as to how they fit together. I'm happy to respond to that. Those are the obvious questions that we need to wrestle with here. In the first place, when you look at what the California Supreme Court held in the Transamerica v. TAB case, what it held was that by virtue of the endorsement, this PUC endorsement we call it, there remained in place this one obligation, which was to satisfy judgments against TAB. That became part of the insurance contract. Is that correct? Well, yes, of course. That was an endorsement to the original insurance contract. But what the California Supreme Court says is that any payment that TIG remained liable to make by virtue of an accident that happened in 1989 arose only under that endorsement. Yes, and it has to be reimbursed. But the question is, more trouble than the Transamerica case, it seems to me, is Samson. Because in Samson you had basically the same endorsement for a slightly different purpose, but still the same endorsement. The obligation arose only because of it. And they held that, and then they went on to hold bad faith. And they didn't discuss the reimbursement problem, but they knew about it. It was in the opinion. You're right, Your Honor. It's quoted in the opinion. So what do we do with the Federal Court? I mean, I would say, you know, off the top, if we were looking at this fresh, that given the Federal cases and given even some more recent California cases, that you might have something. But what do we do with Samson? I think you have to look at when Samson was decided, and I think you have to look at what Samson decided. Samson was decided in 1981, which was 10 years, no, 15 years before the Cates decision, which is sort of the seminal California Supreme Court pronouncement upon the differences between surety obligations and insurance obligations. Which case is that, I'm sorry? Cates. Cates, yes.  Yes, I know. There's also an intermediate case called Schmidt, S-C-H-M-I-T-T, that was decided, I believe, in 1991, 10 years after Samson. That also deals with a bond much, pretty close to what the kind of obligation we're dealing with here, which is essentially a performance bond type of obligation. Those cases hadn't been decided when Samson was before the Court. This Samson opinion is silent with respect to the impact, if any, of this reimbursement right in the endorsement, which is the very thing, we would say, that transforms it into a surety obligation. So what exactly is your position? Is your position that you're responsible only for the statutorily required amount of coverage, or that you were required for the amount of coverage in the policy, which I guess in this case is the same. Is that right? It's the same, Your Honor, yes. So I guess that doesn't matter. But what conceptually, which would it be? Suppose you had a million-dollar policy instead of a $600,000 policy. Would you be responsible for a million dollars or $600,000? $600,000. Well, that can't be. I mean, I think California law is contrary on that point, no? Well, let me correct myself, Your Honor. That's a particularly important point, because it seems to me to tell us something about what's really going on here in terms of, even though it's not directly relevant in this case. Well, the endorsement itself, as I recall, doesn't have a separate limit in it. So I guess you're right, Your Honor. If what the endorsement says is that the policy remains in effect for this limited purpose of advancing and then getting reimbursed, then whatever the limit was, it was. So you would have to pay at least that much. And so everything turns on the reimbursement obligation. Essentially. I mean, I think it's a little bit beyond that, although that's sort of the evidence of what this obligation really is designed to do, which is that it's really the diametric opposite of liability insurance. This obligation under this endorsement is designed to protect the public. It's not designed to protect TAB transportation. And, in fact, when you look at the California Supreme Court's decision in the Transamerica v. TAB case, it says that if reimbursement isn't provided, that would result in an undeserved windfall for TAB. So that tells you right there that the purpose of this obligation is not to protect TAB from judgments. It's to provide a pool of recovery. You didn't say that, though. SAMHSA said there was a dual purpose. SAMHSA said there was a purpose to protect the public and to protect the carrier. That's right. That statement is in SAMHSA. If SAMHSA sinks you, if we say that if SAMHSA sinks you, then by failing to settle, didn't you expose TAB to excess liability? Yeah. You're right. If SAMHSA is it, we lose. Okay. No question. No, I'm sorry. I don't understand that. Why did you – how did you subject TAB to excess liability? Well, I think the question was, we were faced with a settlement demand in a case in which exposure concededly was in excess of limits. Right. We refused that demand. As I understand your entire argument, it's that you weren't subjecting TAB to excess   You didn't. You didn't lose anything because TAB was going to have to pay you back no matter what it was. Well, no, that's true. There's no question about that. I understood the question simply to be – Well, my point is, if you do have a duty to settle, you didn't settle. Yeah. If we – And in an excess judgment, then that's – Right. We're not here trying to overturn 40 years of California precedent on bad faith failure to settle. We just say that it doesn't belong in that analytical box at all. Obviously, I hate the Sampson case for all the reasons you've pointed out, but I think the truth of the matter is Sampson didn't consider this issue. Nobody argued this issue. Cates and Schmidt hadn't been decided. Most of these Federal cases that deal with the exact same endorsement hadn't been decided. But none of them can overrule Sampson. That's the problem. Or did. But I don't think Sampson stands for the proposition that is being urged by the plaintiffs here. I mean, I just don't think – It does directly. I mean, and the only reason it doesn't is that it doesn't deal with the reimbursement issue. But as to what its outcome is, it directly stands for the proposition, no? I guess it's a question of what precedent is. And I don't think a case stands for a proposition that was not considered by the court. Well, but we don't know. Yeah. We don't know whether it was considered. We do know that they knew about the reimbursement because it's in the opinion. That's right. I mean, this is why we suggested that this may be a case for certification to the California Supreme Court, because I think there's just – and we're talking about the very problem with this case, and we understand why the plaintiffs talk about Sampson. I'd be talking about Sampson if I were in their shoes. But it just doesn't deal with the issue that is now before the court, I would submit, which is what is the effect of this reimbursement obligation and the fact that this is – Well, it doesn't deal with it directly. The question is, is it just subsumed by what it does decide? That's fair. That's fair. Well, you don't have to use all your time. I think we – it's a naughty little problem. We know what it is. You can reserve your time. All right. Thank you, Your Honor. If it pleases the Court, my name is Ralph Lombardi, and I'm here representing Amtrak and all the individual plaintiffs and the appellees in this matter. Well, since we've kind of focused the issue here, and I think that counsel for the appellant just said why it should be certified to the Supreme Court, because Sampson did not address the specific argument advanced by TIG. Now that the PUC endorsement is merely a surety obligation, why shouldn't we certify it to the Supreme Court? Well, because I think that if you read Sampson and you read the California insurance cases that have followed Sampson, Sampson is cited regularly, certainly as one of the primary bad faith cases. But not in this context. No, I agree. Not in this context. But I think that the concept of a couple of things. Number one, this is liability insurance. This is not to adopt TIG. Well, it's a very strange sort of liability insurance to make sure we pay it. That's not typical of liability insurance. No, I agree. But if you think about – So it's not liability insurance, really. It's something else. And I don't find it very useful to call it a surety or call it anything. But whatever it is, it's not typical liability insurance. You could, in a way, analogize it to a large deductible or a large self-insured retention. No, because it's 100%. But it's 100%. They're not getting any protection. That's true. But what Sampson says is the insured is entitled to the rights and to the protection that come with a policy of insurance. That's what Sampson says. And it is clear under the federal MCS 90 cases, there's no duty to defend under that endorsement. It's equally clear that under the California PUC endorsement, starting with Kennedy, and as Sampson recognized, there's a duty to defend. Because there's a duty to defend, there's a duty to settle. Now, it may be that, in fact, Transamerica would have been successful, would have gotten its money back. And, in fact, if Transamerica had availed itself of either the provision in the endorsement or the rule that Johansson against Cal State Auto sets out, which is pay your money with a reservation of rights, litigate with the insured, here they didn't even have to do that. They could have simply paid the money and sought reimbursement from TAB. But because they did not, TAB was in a position where it was unable to obtain releases from all the plaintiffs, and what it had to do was agree to judgments that ultimately came in way, way, way in excess of its $600,000 obligation. Well, counsel, what would be wrong with certifying this precise issue to the California Supreme Court to get a precise ruling from the court on this issue that was not really addressed definitively in Sampson? I think that by looking at the principles of bad faith law and the principles of insurance laws that developed in California, looking at Cates, which is the case that counsel cited on the surety reimbursement sort of issue, I think that it is appropriate for this Court simply to conclude as a matter of established California law that Sampson is the law and that it's appropriate. So your position is the law is sufficiently established that we don't need to certify? I believe that it is, yes, Your Honor. I believe that it is. Well, let me see if the one thing you said that was interesting was the duty to defend piece, because the ‑‑ I mean, since Sampson, there have been a series of Federal cases and some California cases suggesting that something turns with regard to excess liability on whether there's a reimbursement obligation or not. But you ‑‑ so if this is different, it would have to be because of the duty to defend and not for any other reason. Is that right? I mean, in other words, what principled argument would you have, aside from Sampson, what would be your principled argument and principle as to why this ought to come out differently than the Federal surety cases and then Cates and so on? The argument is this. By issuing the policy of insurance to which it attached the endorsement, Transamerica undertook certain obligations to its insured. Those obligations under California law have been defined as including a number of things, including a duty to act in good faith, to make settlements and so on. And that's, of course, what Sampson talked about. Now, when we look at ‑‑ Well, but Sampson identified a dual purpose for the Motor Carrier Act, right? The secondary purpose would be protecting the motor carrier from ruinous liability, right? But you don't find any of that in the legislative history of the prior case law, do you? To be honest with you, I have not looked at the legislative history back that far. Sampson was a unanimous decision by the California State ‑‑ But it's not even in the more recent case, not even in Transamerica. But I haven't really gotten to ‑‑ I mean, so far you've said it's the same. You have the insurance obligation, but you haven't dealt with the reimbursement. I want to know why ‑‑ what principle of reason there is why this reimbursement obligation wouldn't lead to the same conclusion if they looked at it fresh as in the Federal cases and as in the Case Line cases. The reason it wouldn't is this. The Federal cases have held, in essence, that the endorsement is standalone. Because it's standalone, there is no duty to defend. We know from Sampson that there is a duty to defend. Now, what the ‑‑ But that's metaphysical. I mean, it's sort of metaphysical. It's a question of whether it stands alone or doesn't stand alone. The fact is, nonetheless, that this theoretically TAB was going to be on the hook for all of this money anyway. Is that not right? No. Why? The reason it's not right is this. the $600,000. True. Now, whether TAB had that money or didn't have the money, the fact is they were entitled to have Transamerica come in and put it up at that point in time when the demand was made, when TAB was in a position to obtain a release of liability from all of these plaintiffs who had claims far in excess of that $600,000. In essence, they were entitled to a loan of that $600,000. Right then and there. Because their insurer, even though their insurer was entitled to recover that money back, did not honor its obligation, did not make the payment, TAB is in a position where it can't settle the case anymore for that $600,000. Now it's facing judgments that ultimately ended up being in excess of $9 million. So it's very significant. The California Supreme Court doesn't make the endorsement stand alone, correct? It does not. And in fact, what the Court says in Transamerica is the effect of attaching the endorsement to the policy, as we held in Sampson, is to automatically incorporate the provisions of the endorsement into the policy. Here, incorporation of the provisions of the endorsement into the policy converted it from a one-year term policy to a policy that remains continuously in effect until canceled. Well, sir, are you saying the Federal cases make them stand alone, but the California Supreme Court incorporated it, so it's not stand alone? I believe so. And the reason I say that is when you look at the Boback case, which says there is no duty to defend under the MCS 90, that would be inconsistent with a finding that, in fact, all the endorsement was part of the policy and all the other policy obligations were incorporated into it. Sampson, on the other hand, says, oh, yeah, it's the whole, the whole policy, the normal rule for construing an insurance policy. You look at the whole thing, the endorsement may modify it, but the fact is that all the obligations to pay an excess settlement derive from the duty to defend as opposed to the duty to indemnify? Well, of course, the Court, the California courts have justified it as coming out of the duty of good faith and fair dealing. I understand that. But about what? Good faith and fair dealing with regard to what? With regard to the? I mean, I understand that the California insurance law has two strains as to the good faith and fair dealing, one of which which comes out of the duty to defend requires a reasonableness inquiry. But the settlement or reasonableness with regard to the position of coverage position, but the settlement strain does not depend on the reasonableness of the coverage position. And I gather that you rely on that, right? In other words, it? Johanson says you deny coverage at your peril. Right. So I guess what I'm asking, does that suggest that this obligation really isn't connected to the duty to defend? What it's connected to is the duty to indemnify. You're supposed to indemnify up to the policy limit, and if you don't, then there's an excess liability and that it isn't really connected to the defense of it. I'm just trying to sort out the pieces here. I'm going to suggest to you that it really is the third duty which encompasses both duty to defend and duty to indemnify, and that is the duty of good faith and fair dealing, which is that neither party to the contract will do anything to impair the other party's ability to enjoy the benefits of the contract. Now, the benefits of this contract included the payment of that $600,000 on behalf of TAB. And if that had happened? I understand that. But what I'm trying to deal with is to see whether there is a principal strain here, aside from the precedential effect of Sampson, that would suggest the California Supreme Court would abide by Sampson because there is some logical reason to explain why they should abide by Sampson. And you suggested to me the most evocative thing you said about that was the duty to defend. That seems to be the difference between the federal cases, the Cates case, and this line. And so I'm trying to see whether the duty to defend could explain a different rule here than in the federal cases and in the surety cases. I think that the duty to defend, if you look at California law, includes the duty to accept reasonable settlement. That's what I'm trying to understand. I think that it does. Well, I don't think counsel – I don't think that counsel disagrees with you there. I think that counsel is – I mean, counsel puts it all back on Sampson, and I'm assuming that you're really putting it in the same place. I mean, it's our interpretation of what Sampson actually held. Because we know what the Supreme Court held, and we're not really talking about whether – I mean, it seemed unusual to me initially that an endorsement that was that old and hadn't been paid on would bring this into play. But that's really off the table at this point. So it's really about Sampson, isn't it? I think that's exactly right, Your Honor. I agree. I just – I think that, again, because the State rules are so different. And I agree. I mean, Justice Gershwin, I think, indicated – Can you explain to me why a duty to defend includes the ability to accept a reasonable settlement? This is all by nature of, you know, open inquiry. I'm really trying to understand how these pieces fit together. Well, I think that what happens is that when we wind them all up together – and I'm sorry to keep coming back to the same point, but the fact is that the implied covenant of good faith and fair dealing is just crucial in California insurance law. And when there is an obligation to defend, there is also an obligation to accept reasonable settlements. Now, that settlement can be accepted with a reservation of rights, a right to litigate coverage issues. That's what Johansson says. And Johansson, Justice Trebainer, specifically said, here's the way you do this. You go in, you protect the insured, and you protect the insurer and its coverage position by paying the money subject to a reservation of rights and litigating with the insured and getting reimbursement in the event the insured's position is – the insurer's position is correct. So I think that if you look at Johansson and you look at this whole host of California authority, that it is a subset of the duty to defend as modified by the – Well, at the time of the initial settlement, where another party put up money as well, that's where TIG was still contesting whether the fact that they hadn't sent in the notice of cancellation, whether – and that nothing had been paid on the policy, whether they would – you know, whether they would have to pay on that, right? That's true. There was Home, who had the coverage at the time of the loss, put its money up. Federal, who was in an identical position to TIG except a year later, put its money up and then sued TAB. Well, now, TIG makes an argument that they say that because this was sort of a hard-fought battle and they – I think to add up the judges that went one way and the judges that went the other way, what – you know, what does all that mean? I mean, obviously, as I've said, you know, maybe that the final result was counterintuitive, but it's what the Supreme Court said. So that's that now. That's over. But the fact that they did have – I think the third DCA went one way, the first went another way until it finally worked its way up. Can they rely on any of that saying that, you know, it was a pretty close issue? Well, let me address that because there's one mistake I think I need to correct. At the time, in 1991-1992, when the demand was made, there was only one appellate case on this point. It came from the third district. It came down in September of 1991. My old court. Yes, exactly. And it was final. As of the time Transamerica – the demand was made and as of the time Transamerica turned it down. And in fact, Transamerica, interestingly, tries to say that, well, this is an expiration versus a cancellation, yet in the letter that they send to defense counsel, they say our position in this matter remains the same. No coverage was enforced in that it was canceled. I thought your position was all of this doesn't matter because the California law is, with regards to settlement, that the reasonable positions are relevant. That's true. I was just trying to respond to Justice Gallagher's comment. And the only thing I would say, you made a comment about the first going the other way. The first went the other way in this case, and then the Supreme Court took it. So there is only one reported appellate case out there, mid-level, and that's Fireman's Clause. But that's the question I was going to ask you. You made a distinction in your brief between first-party liability and third-party liability. Do you still make that distinction in terms of bad faith analysis? Yes. In the failures to settle cases, the denial of coverage cases, as it relates to a third-party situation, the California courts have never adopted a genuine dispute doctrine. I mean, in the cases that counsel cites for that proposition are all first-party cases. There is not a one where there was an excess judgment. And Johansson is the law. Johansson is cited regularly. And Sampson is also cited regularly for the same proposition. You deny coverage at your peril. And if there is a judgment in excess of the limit, the carrier, if it loses the coverage argument, pays the judgment. It's not sort of immediately apparent why there should be two separate rules, but I gather there is. I'm sorry, I didn't understand. It's not immediately apparent why there should be two separate rules, but I gather there is. Well, the argument, I think, is that in the third-party context, you're trying to protect an insured against potentially huge liabilities, and therefore, the rule is that if it's... Or the other is simply contractual. I mean, in the end, if they don't get the money, they can sue for a breach of contract and get the money, but there's not a sort of wild card out there, which is, what is this third party going to do? Precisely. And, of course, they have their tort remedy, but there's no real equivalent of the excess liability. I mean, the insured isn't suddenly liable for more money. If the position is unreasonable, then the insured can recover. Well, it could be. I mean, it could be something similar, like their house is going to fall down or, you know, something terrible is going to happen if they're not defended or they're not paid. Well, and in those cases, if the position is unreasonable, then the first-party insured recovers. Well, thank you, counsel. Thank you. Thank you very much. Very briefly, if I might, I just wanted to address... Well, what about this duty to defend distinction? I'm sorry? To me, the most interesting question is whether the difference, if we were looking at this ab initio, would the fact that or if you were explaining Sampson and why it remains good law, would the duty to defend distinction... First of all, do you agree there is such a distinction? In terms of... That is, that under California law, the endorsement does carry with it a duty to defend, but it doesn't under the federal law or under surety law. Well, I agree that there is that distinction, that that's what Sampson really stands for. I mean, Sampson does talk about duty to defend, and it talks about failure to I don't actually think they thought about it. Let's leave the... But one could come to the conclusion that there was a duty to defend as part of whatever the obligation is without dealing with the reimbursement problem. You still have a reimbursement of the duty of whatever the defense costs are, but the real question is what is carried along with the endorsement? Right. I think the answer, honestly, is that there's no clear answer to that question. I mean, I happen to think the federal cases, which, of course, have dealt with this many more times than the California state courts have, it's really the same endorsement, just a federal versus state version. Federal decisions represent the more developed thinking on it, and they hold that there's no duty to defend. So there aren't most Sampson cases recognizing a duty to defend under endorsement of this kind? That's right. Not a one. Right. So in your view, they both sort of stand or fall together, in other words. Either Sampson... Right. I mean, I think when you look at this, when you look at the California Supreme Court's language and you say, and it says it would represent an undeserved windfall for TAB not to reimburse TIG for whatever TIG advances, that's hard to reconcile with a duty to defend notion unless you're saying that, well, the defense costs are reimbursable, too. But how could Sampson have gotten to the result that it got to without finding that there was a duty to defend on the endorsement? Oh, they clearly found there was a duty to defend. There's no question. So it's really more, you have to say, they knew not what they did. Well, I don't think the lawyers helped them either, including Transamerica's lawyer, which is the predecessor of my client. I think in fairness, those lawyers, the case law that we're looking at right now postdates Sampson. So I think it's... So this is our problem. Our problem is, suppose we thought, looking at all the pieces of paper, that in all likelihood, if the California Supreme Court was looking at this today, it probably or there's a good chance it would have come to a different conclusion. But we also understand that Sampson does come to this conclusion result, resoundingly. Do we certify a question under those circumstances or not? Or do we simply follow case law that if it was coming straight up through the California courts, you know, there's at least a fair chance that the California Supreme Court might grant a petition for hearing? Well, I certainly don't think this Court could sit here today and say, you know, I've got a feeling if that issue came to the current California Supreme Court, the outcome would be different. Now, we'd have to decide whether the current California Supreme Court would be likely to reconsider Sampson in light of what came later. Right. And, again, I think you'd have to look at what Sampson did and didn't address. I mean, we can suppose, I mean, I suppose one can hypothesize that the California Supreme Court must have thought about the reimbursement aspect and so on, but they say nothing about it beyond just quoting the endorsement. See, I think to certify it that I would have to believe that the Supreme Court didn't answer that question. Not that they would like to do it different, you know, that they might do it differently as far as that goes. If Sampson answers that question, then whether, you know, I don't think as the big brother federal court I can say, well, you know, I think you really want to look a little closer. I agree with that. If they didn't answer the question, then, but if Sampson answered that question, then I think you're done. But I don't think Sampson answered it, Your Honor. I really don't. I mean, Cates is the most important Supreme Court pronouncement that we have in our arsenal, and that postdates Sampson by 10 years. So there's no opinion that attempts to reconcile Sampson and Cates, for example. And I think given the stakes in this case that the right thing to do if there's uncertainty about what Sampson really stands for is to certify. Do you happen to know whether any other similar case is kicking around at this point? Is this a one-shot case or not? I think it's a one-shot case, Your Honor. I think it is. And in fact, this PUC regulatory scheme, I believe, has been repealed. I mean, the statute has been repealed, and I think it's now viewed as a matter of federal preemption. Shouldn't that militate against certification if it's kind of an anomalous case? Because generally we certify when we need direction in the broad sense, not for one particular case. Well, I don't think so, Your Honor, because I think it's entirely possible that a failure to settle case could come before this Court arising out of a case with the federal version of this endorsement on it. And we would still be talking about it. The Federal already has, no? Not about the Federal. The Federal said I said, all right. That could easily arise. And I think if such a case were to come before this Court, you'd still be applying California insurance principles, bad faith failure to settle principles in assessing whether a failure to meet an obligation under that MCS 90 endorsement should trigger excess exposure of the sort that sought to be imposed on us here. So I don't think it's just a one-off issue. The only other issue I wanted to address before I sit down, if I have time, is with respect to the Fireman's Fund case, the plaintiffs have repeated, have suggested repeatedly that the Fireman's case, Fund's case addressed squarely the issue involved in the case that we had before the Court and that we just ignored it. That's not true. The Fireman's Fund case dealt with a midterm cancellation of an insurance policy by the insured and then an accident happening within the original term of the policy. And the question was, did that midterm cancellation by the insured require the insurer to file a notice of cancellation with the PUC? That's a very different situation than what we have here. It's just apples and oranges. The genuine dispute standard, which I think is what your question went to. We talked about that as if the Court needs to find a way to evaluate this case within existing California bad faith framework. We don't think it belongs in the failure to settle Bailiwick for all the reasons we've been talking about. If it belongs anywhere, it belongs in this genuine dispute framework, which conceivably ---- But what's your response to opposing counsel's observation that the cases you cited refer to first-party relationship and not a third-party situation? They do, Your Honor. It's a first-party standard. This obligation that we're dealing with here is, you know, we've said it's sort of unique. It's not third-party liability insurance. It's really more akin to a first-party relationship as to anything. It's kind of a hybrid. It is. It is. Well, why isn't it more of a third-party? The only obligations to the third party is really ---- This is not an obligation to settle the claims of a third party. This is just an obligation owed to the public, owed to a judgment creditor. So that's what I mean. The other thing that sort of hasn't been mentioned here is that the endorsement provides for a direct suit by the third party against the insurer, which seems to be a pretty good evidence that that's what's being protected. The third party, the insured person. That's right. That's right. It's really just a ---- it shifts the risk of collection from the plaintiff to the insurance company. That's really what it is. But what about the observation ---- this is ---- you're almost done, but the ---- that by doing so, it's essentially setting up a loan to a possibly insolvent or potentially insolvent company so that it can pay the third parties. And if that loan is not available, the company is going to be in a position where it can't settle the case and is going to be ---- it's sort of a cash flow problem. They might be able to pay this in the long run, but they can't pay it in the short run. And to that degree, it's protecting the insured. It is, but only in the same way that a surety bond does. A surety bond isn't intended to protect the principal under the bond. It's intended for the benefit of the obligee. Now, the principal may be an incidental beneficiary, if you will, of the fact that the bond is performed upon, just like TAB would have been an incidental beneficiary here if we had decided to write the plaintiff's check for $600,000. But that doesn't mean that the purpose of this obligation was to protect TAB or to loan money to TAB so it could make settlements. Okay, counsel. Thank you very much. Thank you both, counsel, for useful arguments and an interesting case.
judges: Berzon, Rawlinson, Callahan